NOTICE
Decision filed 08/12/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 250216-U

NO. 5-25-0216

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

---

| | | |
|---|---|---|
| *In re* MAXIMUS K., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Marion County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | No. 24-JA-45 |
| | ) | |
| Nathan K., | ) | Honorable |
| | ) | Ericka A. Sanders, |
| Respondent-Appellant). | ) | Judge, presiding. |

---

PRESIDING JUSTICE McHANEY delivered the judgment of the court.
Justices Boie and Vaughan concurred in the judgment.

**ORDER**

¶ 1 *Held*: Where a minor's hearsay claims of abuse were sufficiently corroborated, the claims were properly admitted into evidence, and we affirm the trial court's adjudicatory and dispositional orders.

¶ 2 Following up on a mandated reporter's call to the Department of Children and Family Services (DCFS) about physical abuse to a minor child, DCFS sent a caseworker to his school and then to his home. Based upon interviews conducted by the caseworker and interactions between the caseworker and Natasha G., the mother of the abused minor, and Nathan K., mother's paramour, six children were removed from the home. Maximus K. was the youngest child removed from the home. Nathan K. is Maximus K.'s father. The State filed its petition for adjudication of wardship alleging that Maximus K. was neglected because he was in an environment that was

1

injurious to his welfare because Nathan attacked Maximus K.'s half-sibling, Marley G.-B., and because Natasha G. did not protect her children from her paramour, Nathan K. At the conclusion of the adjudicatory hearing, the trial court found that Maximus K. was neglected. The court then proceeded to the dispositional hearing and concluded that Maximus K. should be made a ward of the court placing his custody and guardianship with DCFS. Nathan K. appeals.

¶ 3                                    I. BACKGROUND

¶ 4     On May 1, 2024, the State filed a petition for adjudication of wardship involving six children. The children are Melany, born September 11, 2006; Miles, born August 21, 2008; Marley, born June 27, 2009; Mason, born July 8, 2010; Micah, born May 7, 2013, and Maximus, born April 1, 2022. Natasha is the mother of all six. The State filed separate petitions for Natasha G. (Natasha) and Nathan K. (Nathan). This case involves Nathan and his son, Maximus.

¶ 5     The petition for adjudication of wardship regarding Maximus alleged that he was neglected in that he was in an environment that was injurious to his welfare because Natasha's paramour, Nathan, "strangled, kicked and put his knee into the stomach of [Marley G.-B.], leaving marks and a bruise in violation of section 2-3(1)(b) of the Juvenile Court Act of 1987 (705 ILCS 405/2-3(1)(b) (West 2022)). The State also alleged that Natasha failed to keep Maximus safe, placing him at risk of harm.

¶ 6     At the hearing, Stacy Vance (Vance), a DCFS investigator, testified that he met with Marley G.-B. (Marley) at his school after he told his school counselor that Nathan physically harmed him. Marley informed Vance that he had gotten into trouble for pinching Micah and Nathan sent Marley and Micah to "time out" in the laundry room. Marley did not want to sit on steps in the laundry room and so he kept trying to stand up. When he attempted to stand up, Nathan placed his hands on Marley's shoulders to forcibly push him to a seated position. Then Nathan

2

kicked Marley in one of his legs which caused him to fall to the floor. Although he had a bruise on one of his legs, Marley informed Vance that he did not know if Nathan's kick caused the bruise. While Marley was on the floor, Nathan kneed him in the stomach. Marley stated that when he again attempted to get up from the floor. Nathan became angry, yelled at him, and then strangled him. Marley told Vance that he had made a video and sent it to the school counselor. When Vance asked Marley why he created the video, he said that in a previous situation where Nathan had hit him, he had no video, and thus no evidence to establish what happened. As a result, DCFS "unfounded" that complaint. Vance viewed the video and testified that it was difficult to understand what Marley was saying because of a speech impediment and because he was so upset. However, Vance clearly heard Marley's claim that Nathan had strangled him. The video depicted red marks on Marley's neck, armpits, and his chest area. At the end of the school day, Vance's interview with Marley was not complete, so she drove to Marley's home to continue her investigation.

¶ 7    Vance stated that when she was at the home, both Natasha and Nathan were very upset. She described Nathan as agitated, erratic, and irrational. Vance testified that Nathan was yelling obscenities, knocked trash cans around, left in his vehicle but returned no less upset, and refused to speak to Vance or her coworker.

¶ 8    Vance then continued her conversation with Marley. Marley told her that Nathan apologized and that while he thought Nathan was wrong, he recognized the quality of his home life. Vance testified that in the hour between the two conversations she had with Marley, he had spoken with Natasha and Nathan and began retracting his story.

¶ 9    Vance also spoke with Micah, who told her that he and Marley got into trouble for fighting and were sent to the laundry room for a time-out. Micah told Vance that Marley resisted going to

3

the laundry room and Nathan forced Marley into a seated position on the steps. He told Vance that he had been fearful that Nathan would hurt Marley. Micah said that while he was not afraid of Nathan, he was fearful for Marley because Marley always fights back.

¶ 10    Vance next spoke with Melany who stated that Natasha and Nathan frequently fought about Marley. Melany said that Nathan is often "stressed out" and is short-tempered and gets easily frustrated. She told Vance that when Nathan gets angry, he yells at the children, throws things, and knocks things from tables. While she did not believe that Nathan would intentionally hurt the children, she told Vance that she did not feel that they were safe when he was angry.

¶ 11    Vance also attempted to speak with Natasha who was agitated and yelling at Vance's coworker. Natasha made excuses for Nathan's behavior and stated that the children were safe in her home. Vance and her coworker tried to engage Natasha in a conversation about creating a safety plan for the children to prevent a recurrence of what had happened to Marley. Natasha refused to engage in this conversation. Vance testified that eventually Natasha and Nathan indicated that the interview was over.

¶ 12    Vance and her coworker decided that they needed to take all six children into protective custody due to Nathan's behavior, the intimidation of both Natasha and Nathan, and the history of unfounded DCFS investigations involving several of Natasha's children. Vance testified that Nathan had a prior indicated report in 2006 for sexual molestation of a child and a second sexual-based allegation.

¶ 13    On cross-examination by the guardian *ad litem* (GAL), Vance stated that Melany reported that after her mother began dating Nathan, she felt he was "creepy" and made her uncomfortable.

4

Melany also reported that Nathan had done some "inappropriate" things to her.[1] Vance testified that Natasha had unfounded DCFS cases in 2023, 2020, and 2019. This investigation was the ninth one involving Nathan, three of which involved Natasha's children. Natasha told Vance that she was aware that DCFS had investigated Nathan, but all that had been unfounded. Conversely, Nathan said that Natasha knew about his indicated DCFS investigations. Natasha then backtracked and stated that she did not understand the meaning of the term, "indicated."

¶ 14    Natasha was employed and Nathan was unemployed and was the primary caretaker of the six children. Natasha informed Vance that while Marley was allowed to see the school counselor, he did not receive outside counseling because she did not believe in counseling. Her concern was that counselors only wanted to prescribe medications and that if children are in counseling, DCFS gets contacted. The "kids" told Vance that Natasha and Nathan told them not to speak with the school counselors. Natasha and Nathan both stated that DCFS's presence in their home was Marley's fault.

¶ 15    Natasha testified that she would do anything to get her children back. Specifically, she said that if the children needed to engage in counseling, she would take them. Nathan testified that he had been dealing with DCFS for over 20 years "and they've been harassing me and mentally abusing me." He concluded his testimony by stating that he would not hurt his children.

¶ 16    At the conclusion of the shelter care hearing, the trial court found that there was "overwhelming evidence of a long, long period of abuse and neglect." The court found probable cause to believe that the minors required "authoritative intervention" and that the situation was a matter of immediate and urgent necessity for the protection of the minors, warranting shelter care.

---

[1]In the family's first family service plan dated June 21, 2024, DCFS indicated that Melany reported that Nathan showed her how to access pornography at the age of 10 and had also informed her that he had become sexually aroused and then "showed her."

5

705 ILCS 405/3-12(2) (West 2022). The court stated that DCFS and law enforcement committed a grave disservice to the children, stating that "[t]he fact that this child had to make a video because—so that people would believe him when DCFS did not [previously believe him]." The court ordered DCFS to produce all founded and unfounded reports involving Natasha and/or Nathan to the state's attorney's office and to the GAL. The court ordered DCFS to get the children into trauma informed counseling, noting that by changing his story, Marley was taking the blame for what had happened to him in his encounter with Nathan. The court also directed DCFS to have the children evaluated to determine if any medication is required. The court ordered Natasha and Nathan to have no contact with the children.

¶ 17 On May 29, 2024, the court held the next hearing. Natasha had hired counsel. The trial court appointed counsel for Nathan. Nathan asked the trial court to allow him to have visitation with Maximus. Samantha Bustos (Bustos), the caseworker with Hoyleton Youth and Family Services,[2] informed the court that the children were now in separate placements and that she intended to set up sibling visits as well as visits with the parents. The GAL reminded the court that the judge entered a no-contact order at the shelter care hearing barring the parents from visits with the children.

¶ 18 On June 21, 2024, DCFS filed a family service plan. DCFS reported multiple risk factors that existed when the case was opened: sexual abuse as outlined by Melany; physical abuse to Marley; emotional abuse to Marley because he was targeted as the source of the family's problems; excessive discipline because the duration of any periods of being "grounded" was several months; Nathan's "force, control, and/or intimidation" approach to parenting; and Natasha's and Nathan's

---

[2]DCFS engaged the services of Hoyleton Youth and Family Services in these cases. Throughout this order, Hoyleton Youth and Family Services will be referred to as DCFS.

failure to understand the impact of their behaviors on the mental and emotional wellbeing of the children. DCFS set a permanency goal of return home within 12 months. DCFS determined that Nathan needed the following assessments and services: a psychosexual assessment and any recommended services, domestic violence services, random drug tests, and a mental health assessment and any recommended services.

¶ 19      DCFS filed an integrated assessment, noting that DCFS interviewed Nathan and completed his integrated assessment. Nathan was unemployed, but scheduled to begin work at North American Lighting through a temp agency. DCFS outlined the 2006 indicated sexual molestation case involving a stepson, who was seven years old at the time and had behavioral concerns. He alleged that his former wife's paramour was the person who had molested the child. He was currently living with his father, but wanted to find his own place. Nathan completed a sexual offender evaluation, and DCFS confirmed that the evaluator had no concerns with Nathan. DCFS noted that Nathan had anger management/emotional regulation symptoms. DCFS stated that there had been concerns about Nathan physically abusing the children since 2019, especially with Marley. In addition, DCFS noted the chores and strict consequences Nathan imposed upon the children. DCFS noted Nathan's past and present violent behavior, antisocial behavior with difficulty in intimate relationships, and a history of affective and behavioral instability. Based upon these factors, DCFS believed there was a likelihood of recurrent violence. DCFS believed that reunification with Maximus would be difficult unless Nathan "takes accountability for his actions, can identify protective actions to keep his son safe, and is able to gain some insight into his behaviors which have led to the reasons for DCFS involvement." DCFS recommended that Nathan engage in individualized therapy focused on anger management and emotional regulation strategies, obtain a psychiatric evaluation, engage in parenting services, obtain and maintain safe

7

and appropriate housing, and develop appropriate and safe childcare for Maximus. In addition, DCFS intended to authorize supervised visitation with Maximus when the trial court lifts the no-contact order.

¶ 20    DCFS filed its next report on June 24, 2024, outlining the required service plan steps that needed to be completed. All of the children, except Maximus, were referred for mental health or trauma-informed therapy. Maximus would receive physical, occupational, and developmental therapies.

¶ 21    On June 24, 2024, the trial court held the next hearing it labeled as a "pretrial." The purpose of the hearing was to select a date for the adjudicatory hearing. The court noted that the statute mandated a 90-day timeline. The parties indicated that they had no objection to holding the adjudicatory hearing past the statutory 90-day rule. The court set the adjudicatory hearing for August 26, 2024.

¶ 22    On July 18, 2024, DCFS filed a "Pre-Adjudication Status Report." DCFS reported that after Nathan attacked Marley on April 26, 2024, he fled the house and went to a friend's house where he filmed the video showing the marks on his neck, chest, and underarms. Upon his return home, Nathan kicked him and hit him on the head with a shoe. Marley reported that Natasha was present and witnessed this second attack. The children informed DCFS that they had been instructed by Natasha and Nathan to never speak to school counselors. Marley stated that he was concerned about the fallout from his video and report of the incident to his school counselor because the last time he reported this type of incident, his subsequent punishment lasted several months.

¶ 23    On August 23, 2024, Natasha filed a motion for a psychiatric evaluation of Marley, noting that Marley had a "long history of opposition and defiance to authority." The motion states that

teachers have informed Natasha that Marley threatened to accuse her of wrongdoing by means of self-made video. Natasha asked the trial court to order the psychiatric evaluation prior to the adjudicatory hearing. On August 23, 2024, Nathan filed a similar motion seeking a psychiatric evaluation. On September 13, 2024, Nathan filed a motion asking the court to modify the no-contact order so that he could have visitation with Maximus.

¶ 24 On September 16, 2024, the trial court held a hearing on a motion to continue the adjudicatory hearing because of Nathan's motion seeking a psychological evaluation of Marley. The State asked the trial court to proceed with the adjudicatory hearing, stating that there was no need for delay or an independent evaluation. The trial court agreed and denied the motion for a mental examination, on the basis that it would be improper for a mental health evaluator to render opinions about Marley's credibility, stating: "It is absolutely contrary to any rule of evidence that exists with regard to cross-examination and a court's determination of a witness' veracity." The adjudicatory hearing was set for November 25, 2024.

¶ 25 On September 17, 2024, DCFS filed its next report noting that Nathan began mental health services on June 7, 2024, and was reported to be attending classes, was cooperative, and was making significant progress. Nathan reported that he was still trying to get set up for domestic violence services, and to obtain a psychosexual evaluation.

¶ 26 On September 18, 2024, the court held a hearing on Nathan's motion to modify the no-contact order. Neither DCFS nor the GAL had any concerns about the court lifting that order. The trial court granted Nathan's request.

¶ 27 On November 25, 2024, the trial court began its adjudicatory hearing. The State called three witnesses: Stephanie Clark, Sarah Purcell, and Stacy Vance.

¶ 28    Stephanie Clark (Clark) testified that she was the school counselor that Marley spoke to after the incident. Marley spoke with Clark at the beginning of the school day on April 29, 2024. She described his demeanor as "sad" and said that he had tears in his eyes. Marley then emailed her the video he created to document his injuries. He informed Clark that he and his brother, Micah, were being punished, and Nathan held Marley down on the stairs which hurt him. Marley described being strangled and kicked in a leg. Clark also interviewed Micah who indicated that Marley and Nathan had gotten into a fight. Marley told Clark that he did not want his siblings "taken away," but that he could no longer live there. Clark stated that Marley spoke with her about similar issues in 2023—that Nathan had hurt him. Marley informed Clark that he made the video this time to have proof. Clark testified that both Marley and Micah had previously informed her that their parents told them not to speak with her. On cross-examination, Clark stated that Marley spoke with her at least once per month over the past three years. She testified that she did not know what issues led the school to conclude that Marley needed an IEP.

¶ 29    Sarah Purcell (Purcell) testified that she was one of the Salem police officers at Natasha and Nathan's home to assist DCFS with its investigation of Marley's claims. Purcell said that Natasha and Nathan were upset and uncooperative with DCFS, calling the workers names and repeatedly questioning why DCFS was there. Nathan left and returned to the house twice during the investigation as he became extremely agitated. Natasha told Purcell that she and Nathan never physically punished the children. Instead, she stated that they took away games. When DCFS decided that they were taking all six children into protective custody, Natasha became extremely upset and tried to keep the police and DCFS from entering the home to get the children.

¶ 30    Vance testified that she became involved in this case when DCFS received a hotline call about Marley having been physically abused. Vance went to Marley's school where she spoke

10

with Marley and Mason. Marley told Vance that he and Micah had been pinching each other on the date of the incident, which angered Nathan. Nathan ordered both boys to the laundry room as punishment. Marley did not want to sit on the stairs in the laundry room and Nathan pushed him down onto the stairs. When Marley stood up, Nathan kicked Marley in the leg. Marley told Vance that he then doubled over, and Nathan used his knee to strike Marley in the stomach. Then Nathan put his hands around Nathan's neck and choked him until Marley could not breathe. Marley showed her the bruise on his leg, but informed Vance that he was not certain that was where he had been kicked by Nathan. She viewed Marley's video and testified that it demonstrated that Marley had red marks around his neck and shoulders. Vance characterized his demeanor as depicted on the video as "hysterical," and stated that he was crying uncontrollably. He also informed Vance that Nathan hit Micah. Vance stated that Marley wanted "something done," in that he was tired of being battered at home. Marley advised that whether he felt safe in his home depended upon whether Nathan was angry. Vance testified that she also spoke with Mason, who denied any physical abuse in the home. He said that he was in the other room when Marley and Micah got into trouble.

¶ 31   Vance next went to the police department to secure assistance and then went to the home. Both Natasha and Nathan were home when Vance arrived and were resistant to allow DCFS to speak with the children, but eventually Natasha acquiesced. When Vance attempted to resume her conversation with Marley, Marley said that he had made a mistake, and that he had spoken with Natasha and Nathan and "[t]his wasn't going to happen again." Marley told Vance that he knew Nathan never intended to hurt him.

¶ 32   Vance also spoke with some of the other children. Micah informed Vance that he saw Nathan try to force Marley to sit on the laundry room steps. Micah said that he was frightened by

11

these events because he did not want to see Marley get hurt. Melany advised that Nathan had hit all of the children before, but mostly Marley. Melany stated that Nathan is short-tempered, frequently stressed, and gets easily frustrated. However, if Nathan was not angry or upset, she felt safe in the home. Melany also informed Vance about sexual statements Nathan made to her. Miles told Vance that he was in school at the time of the incident, and that there was no physical abuse in the home. Vance testified that they checked Maximus's body for any injuries and found none.

¶ 33 Vance stated that she was concerned about the level of protection Natasha was providing the children, as Natasha disputed what Marley and Melany said by claiming that they misinterpreted or were taking things out of context. Vance said that she attempted but was unable to speak with Nathan that night.

¶ 34 The adjudicatory hearing resumed on December 16, 2024. At the beginning, Nathan's attorney asked the court to direct a verdict in his favor stating that there was no corroboration of Marley's allegations. Natasha's attorney then adopted the motion for a directed verdict. The GAL contended that Marley's allegations were, in part, corroborated by the statements of Melany and Micah. In addition, Marley had a bruise on his leg, and injuries to his neck and shoulders were visible on the video. Natasha's attorney pointed out that Micah's statements to DCFS only stated that Nathan picked Marley up by the back of his neck and forced him into a seated position.

¶ 35 The trial court responded that the statement of a child regarding an allegation of abuse is admissible, but if otherwise uncorroborated, the child's statement cannot form the sole basis for a finding of abuse or neglect. The court noted, however, that in listening to the testimony, Micah said that Marley and Nathan got into a fight, and that Micah saw Nathan push Marley down onto the steps. Micah also said that he did not want to see Marley get hurt. The video revealed the red marks around Marley's neck and the bruise on the leg was seen by the school counselor. The court

12

also took note of how upset Marley was in the video. When Marley was questioned, he said that he wanted to cancel his report because it would make it worse. Marley also stated that Nathan did not intend to hurt him, and that Natasha and Nathan said that the situation would not happen again. Moreover, Micah and Marley were told by Natasha not to talk to the school counselor. Melany informed DCFS that she had witnessed Nathan hit all the children and stated that he hit Marley the most. Melany said that Nathan was short-tempered, and she only felt safe if Nathan was not upset. Thus, the court found that Marley's statements were corroborated and denied the motions for directed verdict.

¶ 36 Nathan testified at the adjudicatory hearing that he had lived with Natasha and her children for over six years. On April 26, 2024, the children went to school for a half-day and were home before noon. Marley and Micah were in the living room, and he told them to be quiet because Maximus was sleeping. Then, the boys began fighting. He told them to come into the laundry room for a time-out. Nathan said that Marley threw "a fit" and would not sit on the stairs. Nathan told Marley to calm down. Marley told Nathan that he did not have to listen to him, and then Marley tried to tackle him. Nathan testified that he put a wrist on Marley's left shoulder and pushed him away to break Marley's grip. After Marley cussed at Nathan, Nathan said that he told Marley to get out of the laundry room. A few minutes later, Micah informed Nathan that Marley had "run away." A police officer brought Marley home informing Nathan that Marley was at a friend's birthday party. Nathan said that Marley had behavioral issues including lying, stealing, and breaking things. Nathan denied that he ever struck Marley, placed his hands around his neck, or kneed him in his stomach.

¶ 37 On cross-examination, Nathan denied that he had a temper. He testified that he contacted Natasha to inform her that Marley had run away, and she came home from work early. He stated

that Natasha called the police to report Marley's absence. The GAL asked Nathan why the children were afraid of him, and he responded: "Because I'm their dad and I discipline them." Nathan denied telling the children not to speak to school counselors.

¶ 38    Natasha's attorney called DCFS caseworker Bustos to testify. She is employed as a foster care case manager by Hoyleton Youth and Family Services. She testified that after an incident with Marley at school, he underwent a screening to determine appropriate steps for mental health services. Marley was currently inpatient at Lincoln Prairie Behavioral Health Center in Springfield. On or about November 18, 2024, Marley got into a verbal altercation with another student at school and told the student to "shut up" or he was going to "shoot up the school." Marley contended that he had been talking about a video game called Modern Warfare and that this other student misunderstood him. The school suspended him until December 2, 2024. While Marley was eligible to be released from the psychiatric hospital on December 4, 2024, DCFS scheduled a "clinical staffing" to find Marley a more specialized foster placement to better manage his diagnosis of disruptive mood dysregulation disorder. Bustos testified that Marley had previously been diagnosed with attention-deficit/hyperactivity disorder (ADHD), for which he required medication. DCFS also recommended mental health therapy for Marley based upon his integrated assessment.

¶ 39    Natasha testified that she had been in a relationship with Nathan since 2018, and he had watched the children since the middle of 2018. Marley displayed emotional issues that began in the first grade, and he had an IEP at school from first through the eighth grades. Beginning in the fourth grade, Marley's IEP was focused upon his "emotional disability." Natasha testified about the previous unfounded DCFS contact in 2023. At that time, Marley claimed that Nathan hit, kicked, and punched him, and threw him into a wall or coffee table. Natasha did not remove Nathan

14

from the home after this incident because "[t]here were no marks on Marley and he had a history of lying."

¶ 40    During Natasha's testimony, her attorney asked the trial court to continue the adjudicatory hearing until he received the psychiatric records or a psychiatric report regarding Marley's new diagnosis of disruptive mood dysregulation disorder. The trial court denied the request. Natasha said that there have been times when Marley's mood would radically swing. The mood swings occurred when he was angry and/or when he did not "get his way." The mood swings began when Marley was in the first grade. During a mood swing, Natasha stated that Marley behaves in an erratic and emotional manner during which he screams, stomps, throws and breaks things. Natasha said that he becomes unintelligible when he gets extremely agitated. She said that these "attacks" occurred about twice per month. She testified about videos she took of Marley during one of his previous mood swings in April 2023, approximately one month after the prior DCFS case had been determined to be unfounded. She stated that he had been disciplined by taking away his PlayStation after he and Mason had an argument. On April 26, 2024, Nathan called her at work to tell her that Marley had run away. She contacted the police who reached out to Marley's school principal to ascertain who his friends were. Natasha then left to take Miles to the eye doctor in town. While she was with Miles, Nathan notified her that the police had located Marley and brought him home. Natasha said that she saw no marks on Marley's body that day. She also testified about receiving an email from Marley's school counselor on September 14, 2023. The counselor alerted her to statements Marley made in school that he wanted to kill himself.

¶ 41    On cross-examination by the State, Natasha stated that she had only begun videotaping Marley in 2023 when his behavior worsened. When asked if she tried to get help for Marley, Natasha pointed to the school professionals and said that she "was trying." She testified that

oftentimes when he had these mood swings, he would grab the back of his neck and hit himself in the head. She said that she began videoing him because he was becoming more violent and she was fearful for her baby, Maximus.

¶ 42    On cross-examination by the GAL, Natasha clarified that during summer break, Marley did not have access to counselors or social workers, stating that he could talk to her or to her parents. She confirmed that she never sought counseling for Marley and never spoke to his pediatrician about his "behaviors." Although she testified that Marley's behavior became worse in 2023, she sought no additional resources, stating: "I thought the school was sufficient." Natasha denied that Melany told her about Nathan's sexualized behavior. She testified that before this DCFS case was opened, she and Nathan contemplated whether he should move out because of Marley's behavior. She confirmed that Nathan struggled with parenting Marley but stated that "everyone" struggled with Marley. Natasha testified that she was the sole financial support for the family and that she did not have money to hire a psychiatrist or a psychologist for Marley.

¶ 43    On recross-examination by the State, Natasha was asked to confirm that she could not afford a psychiatrist or a psychologist. She responded that the school had not recommended further counseling: "that's why I thought it was fine." She also stated that she lacked funds for mental health care for Marley but confirmed that Marley was on Medicaid. She testified that she had tried to call some providers, but that they would not take the medical card. However, she then testified that she did not know how to get a psychiatrist or psychologist. She admitted that because the children were on Medicaid, there would be no cost for a psychiatric appointment.

¶ 44    In ruling that the State had met its burden of proof by a preponderance of the evidence that Maximus was neglected because (1) he was in an environment injurious to his welfare because Nathan physically harmed Marley and (2) Natasha failed to keep Maximus safe and placed him at

16

risk of harm, the court acknowledged that Marley's behavior was "frustrating and difficult to deal with," but stated that Natasha and Nathan were "ill equipped in addressing [Marley's behavior] with something other than violence." The court commented on Natasha's behavior as witnessed by Vance which included yelling, refusing to allow DCFS to see Maximus, and calling DCFS workers and police officers names. The court noted that both Melany and Marley stated that Natasha was aware of Nathan's abuse and did nothing. The trial court filed its adjudicatory order on December 18, 2024, and set the dispositional hearing for January 15, 2025.

¶ 45   DCFS filed a dispositional hearing report on January 10, 2025, noting that Nathan continued to live with his parents in Flora and was unemployed. He was not currently receiving mental health services. Nathan recently told DCFS that he had done nothing wrong, that the court listened to DCFS's lies, and that the court and DCFS considered these children as "a paycheck." He also stated that he should be allowed to discipline the children as he "sees fit." Based upon Nathan's statements, DCFS stated that it intended to refer him for a psychological evaluation. Additionally, Nathan attended Maximus's occupational therapy sessions. The workers reported that Nathan does not engage in the therapy sessions and informed the workers that as soon as Maximus is returned to his care, Maximus will no longer have therapy. DCFS asked its Sexual Abuse Service Coordinator to find an approved evaluator and to have Nathan reassessed because the more recent sexual incident with Melany occurred after he was originally evaluated and determined to be at low risk to reoffend. Nathan had been consistent with his weekly visits with Maximus.

¶ 46   Overall, DCFS found that progress on the recommended service goals was not substantial and stated its concern about returning the children to Natasha and Nathan because both parents failed to understand why DCFS became involved. DCFS recommended that the permanency goal

17

remain return home within 12 months. On January 15, 2025, Nathan filed a motion asking the court to reconsider its adjudicatory order, arguing that the court's decision to deny his motion for a directed verdict in that hearing was contrary to the manifest weight of the evidence because the evidence admitted establishing abuse and/or neglect constituted inadmissible hearsay.

¶ 47     DCFS filed a report on February 12, 2025, to update the court prior to the dispositional hearing. DCFS reported that Nathan's housing and employment statuses remained unchanged. He had begun, but not completed, his mental health services reassessment. DCFS noted that Nathan was no longer able to attend Maximus's occupational therapy sessions due to schedule changes. DCFS spoke with Maximus's speech therapy provider who informed DCFS that Nathan does not engage in the services but tells the therapist that Maximus "was doing all of this stuff before he was taken away." Nathan blamed DCFS for Maximus's issues with speaking and developmental delays. DCFS's ordered psychological evaluation and parenting capacity referrals were pending as of the date of the report. Nathan reported finding his own provider for a psychosexual assessment. DCFS scheduled a psychosexual evaluation for Nathan with a provider who practiced at the Behavioral Science Institute. A scheduled date for this evaluation was not in the report. Maximus continued to make progress on early intervention services and was recently referred to Cardinal Glennon Hospital in St. Louis for an autism evaluation. Visits with Maximus were going well.

¶ 48     DCFS indicated that overall progress towards completion of service goals was not substantial. DCFS remained concerned that although some services were completed, neither parent would acknowledge what led to the children being removed from their care, with Nathan blaming the children.

18

¶ 49    The court held the dispositional hearing on February 12, 2025. Before the hearing began, the court denied Nathan's motion to reconsider and proceeded to the dispositional hearing. Nathan did not testify at the hearing.

¶ 50    The court took issue with Natasha and Nathan seeking their own psychosexual evaluations without the evaluator having any background to know why the parents were presenting themselves for an evaluation. The court also stated that the parent's contention that Marley created the situation—that he faked injuries to get Natasha and Nathan reported to DCFS—was unfair to Marley because Natasha never sought a diagnosis and/or treatment for him. The court noted that the purpose of service plan objectives was to effectuate behavioral change and then stated that there had been zero change in the behaviors of Natasha and Nathan since the case was opened.

¶ 51    On February 19, 2025, the trial court entered its dispositional order finding that Nathan and Natasha were unfit parents for reasons other than financial circumstances alone, maintained the permanency goal of returning Maximus home within 12 months, made Maximus a ward of the court, and placed custody and guardianship of Maximus with DCFS.

¶ 52    Nathan timely appealed the adjudicatory and dispositional orders.

¶ 53                                   II. ANALYSIS

¶ 54    The Juvenile Court Act of 1987 (705 ILCS 405/1-1 *et seq.* (West 2022)) provides a step-by-step process to be used in determining whether a child should be removed from his or her parents and made a ward of the court. *In re Arthur H*., 212 Ill. 2d 441, 462 (2004). The first step of the process begins with the State filing a petition for wardship. *Id.* A temporary custody hearing is conducted and the court must "determine whether there is probable cause to believe that the child is neglected, whether there is an immediate and urgent necessity to remove the child from the home[,] and whether reasonable efforts have been made to prevent the removal of the child or

19

that no efforts reasonably can be made to prevent or eliminate the necessity of removal." *Id.* If the trial court finds probable cause, the child is placed in temporary custody and the process continues. *Id.*

¶ 55 The second step of the process, the adjudicatory hearing, requires the court to determine whether the child was the subject of abuse, neglect, or dependence. *Id.* If the State fails to prove the allegations of abuse, neglect, or dependence by a preponderance of the evidence, the petition must be dismissed. *Id.* at 464. If the court finds that the State has proven abuse, neglect and/or dependence, the case proceeds to the third step, which is a dispositional hearing. 705 ILCS 405/2-21(2) (West 2022).

¶ 56 "At the dispositional hearing, the court shall determine whether it is in the best interests of the minor and the public that he be made a ward of the court, and, if he is to be made a ward of the court, the court shall determine the proper disposition best serving the health, safety and interests of the minor and the public." *Id.* § 2-22(1). The court must also consider "the permanency goal set for the minor, the nature of the service plan for the minor and the services delivered and to be delivered under the plan." *Id.*

¶ 57 "The purpose of a dispositional hearing is not to terminate parental rights." *In re April C.*, 326 Ill. App. 3d 225, 237 (2001). Rather, "a dispositional hearing serves the purpose of allowing the circuit court to decide what further actions are in the best interests of a minor, and the hearing and ruling on whether to make a minor a ward of the court gives the parents 'fair notice of what they must do to retain their rights to their child' in the face of any future termination proceedings." *Id.*

¶ 58 "Cases involving abuse, neglect and wardship are *sui generis*; each case must be decided on its own distinct set of facts and circumstances." *In re M.W.*, 386 Ill. App. 3d 186, 197 (2008).

20

"Though the court, when making the wardship determination, considers the specific parent's capability to care for the child, *** the wardship determination is based on the best interest to the child when considering the totality of the circumstances surrounding the child's life." *In re D.S.*, 2018 IL App (3d) 170319, ¶ 15. A dispositional order is generally considered final and appealable. *In re Brandon S.*, 331 Ill. App. 3d 757, 760 (2002) (citing *In re D.S.*, 307 Ill. App. 3d 362, 365 (1999)).

¶ 59    The trial court's findings regarding wardship and fitness at the dispositional hearing stage are given great deference because it has the best opportunity to view and evaluate the parties and their testimony. *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1064 (2006); *In re T.B.*, 215 Ill. App. 3d 1059, 1061 (1991). Because a trial court is in a superior position to assess the credibility of witnesses and weigh the evidence, an appellate court will not overturn the trial court's findings merely because the appellate court may have reached a different decision. *In re Lakita B.*, 297 Ill. App. 3d 985, 994 (1998). A trial court's determination of wardship or fitness will be reversed "only if the factual findings are against the manifest weight of the evidence." *In re Kamesha J.*, 364 Ill. App. 3d 785, 795 (2006). A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly apparent. *In re C.N.*, 196 Ill. 2d 181, 208 (2001).

¶ 60    On appeal, Nathan contends that the trial court's order adjudicating Maximus as a neglected child should be reversed because the trial court allowed uncorroborated hearsay statements of the minor children who did not testify at the adjudicatory hearing and were also unavailable for cross-examination. He argues that the State presented no other evidence to prove the allegations against him by a preponderance of the evidence.

¶ 61    Initially, we note that "admissibility of evidence at trial is a matter within the sound discretion of the trial court, and that court's decision may not be overturned on appeal absent a

21

clear abuse of discretion." *People v. Illgen*, 145 Ill. 2d 353, 364 (1991). The trial court will only be found to have abused its discretion if the court's decision is " 'arbitrary, fanciful or unreasonable' " or " 'where no reasonable man would take the view adopted by the trial court.' " *People v. M.D.*, 101 Ill. 2d 73, 90 (1984) (quoting *Peek v. United States*, 321 F.2d 934, 942 (9th Cir. 1963)).

¶ 62    The Juvenile Court Act of 1987 provides evidentiary rules applicable in juvenile court proceedings, including procedures to follow in adjudicatory hearings, as follows: "The standard of proof and the rules of evidence in the nature of civil proceedings in this State are applicable to proceedings under this Article." 705 ILCS 405/2-18(1) (West 2022). Proof of abuse of one minor shall be admissible evidence on the issue of the abuse of any other minor for whom the mother or father is responsible. *Id.* § 2-18(3). Previous statements from the abused child related to said abuse or neglect "shall be admissible in evidence"; "[h]owever, no such statement, if uncorroborated and not subject to cross-examination, shall be sufficient in itself to support a finding of abuse or neglect." *Id.* § 2-18(4)(c). The term, corroborate, has been defined as "to add weight or credibility to a thing by additional and confirming facts or evidence." (Internal quotation marks omitted.) *In re Custody of Brunken*, 139 Ill. App. 3d 232, 239 (1985). Essentially, "corroborating evidence is evidence that makes it more probable that a minor was abused or neglected." *In re A.P.*, 179 Ill. 2d 184, 199 (1997). "The form of corroboration will vary depending on the facts of each case and can include physical or circumstantial evidence." *Id.* However, "[c]orroborating evidence requires the presence of 'independent evidence which would support a logical and reasonable inference that the act of abuse or neglect described in the hearsay statement occurred.' " *In re Marriage of Flannery*, 328 Ill. App. 3d 602, 613-14 (2002) (quoting *In re A.P.*, 179 Ill. 2d at 199). Sufficient

22

corroborating evidence must be decided on a case-by-case basis. *In re J.L.*, 2016 IL App (1st) 152479, ¶ 89 (quoting *In re Gabriel E.*, 372 Ill. App. 3d 817, 825 (2007)).

¶ 63    Here, Marley made his statements to a school authority figure and provided the self-recorded video reflecting his physical injuries on his neck, shoulders and abdomen. As Marley did not testify during the adjudicatory hearing and was therefore not subject to cross-examination, we must determine if there was sufficient corroborative evidence. *In re J.L.*, 2016 IL App (1st) 152479, ¶ 88.

¶ 64    Sibling statements have been found to be proper corroborating evidence. In *In re J.L.*, 2016 IL App (1st) 152479, ¶¶ 79, 92, a child's hearsay statements were corroborated by an older sibling describing her own abuse. Similarly in *In re K.O.*, 336 Ill. App. 3d 98, 102, 109 (2002), one child told a police officer that she had been sexually abused by her father, and a DCFS investigator provided testimony that she spoke with another sibling, who witnessed the sexual abuse. And in *In re Alexis H.*, 401 Ill. App. 3d 543, 561 (2010), two siblings were separately sexually abused, each corroborated the other's statements, and the appellate court concluded that these statements made it more probable that the children were abused.

¶ 65    "Corroboration of the occurrence of the abuse or neglect can be provided through circumstantial evidence, such as *** other physical evidence, [or] eyewitness testimony ***." *In re An. W.*, 2014 IL App (3d) 130526, ¶ 63; see also *In re Custody of Brunken*, 139 Ill. App. 3d at 239. Moreover, corroboration can come in the form of an admission by the accused. *In re A.P.*, 179 Ill. 2d at 199; *In re An. W.*, 2014 IL App (3d) 130526, ¶ 63.

¶ 66    This case began with Marley's report to a school counselor about being beaten and choked by Nathan. Marley contends that he contemporaneously filmed the injuries he received from Nathan after he fled the house. Marley's video serves to corroborate the occurrence of the abuse

23

with circumstantial evidence of physical evidence of the injuries he received. *In re An. W.*, 2014 IL App (3d) 130526, ¶ 63. Investigators also confirmed that Marley had a bruise on one of his legs that corresponded with Marley's claim of either being kicked by Nathan in the laundry room or later at the dinner table on the date of the incident. Finding the bruise on Marley's leg after he reported that Nathan kicked him in that leg provides corroborative evidence like a medical report or an examination establishing signs of abuse. *In re A.P.*, 179 Ill. 2d at 199.

¶ 67    Marley's sibling, Micah, was present for the laundry room incident and informed DCFS that Marley and Nathan got into a fight. Micah noted that Nathan kept pushing Marley down onto the stairs using his hands on Marley's shoulders. Micah expressed fear that Marley would be hurt by Nathan's actions on that date. Another sibling, Melany, testified that only Natasha struck her, while Nathan struck all of the children, but especially Marley. These statements by Marley's siblings provide sufficient corroboration of Marley's claim—corroboration that Marley was attacked on the day of the specific incident, as well as on other occasions. *In re J.L.*, 2016 IL App (1st) 152479, ¶¶ 79, 92; *In re K.O.*, 336 Ill. App. 3d at 102, 109; *In re Alexis H.*, 401 Ill. App. 3d at 561.

¶ 68    Furthermore, before police and DCFS arrived at Natasha and Nathan's home, they spoke with Marley and he later stated that he did not think that Nathan intended to hurt him, but that both Natasha and Nathan promised him that the actions taken would not happen again. These statements by Natasha and Nathan, as restated by Marley to investigators, are corroborative admissions that something happened to Marley on the day he ran away and filmed the injuries he received.

¶ 69    We do not find that the trial court abused its discretion in admitting the corroborative evidence during the adjudicatory hearing. *Illgen*, 145 Ill. 2d at 364.

24

¶ 70                                    III. CONCLUSION

¶ 71    For the above reasons, we affirm the trial court's adjudicatory and dispositional orders.


¶ 72    Affirmed.